IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CHESTNUT HILL SOUND INC., <br><br> Plaintiff, <br><br> v. <br><br> APPLE INC., <br><br> Defendant. | Civil Action No. 15-261-RGA |

MEMORANDUM ORDER

On March 25, 2015, Plaintiff Chestnut Hill Sound Inc. ("CHS") filed a one-count Complaint (D.I. 1) against Defendant Apple Inc. for infringement of U.S. Patent Nos. 8,090,309 (the "'309 patent") and 8,725,063 (the "'063 patent). Plaintiff subsequently filed an Amended Complaint. (D.I. 21). Before the Court is Plaintiff's Motion for Preliminary Injunction. (D.I. 8). The motion is fully briefed. (D.I. 9, 17, 20). For the reasons that follow, the Court will deny Plaintiff's motion for injunctive relief.

Pursuant to 35 U.S.C. § 283, a court in a patent case "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283.[1] "The grant or denial of a preliminary injunction pursuant to 35 U.S.C. § 283 is within the discretion of the district court." *Novo Nordisk of N.A., Inc. v. Genetech, Inc.*, 77 F.3d 1364, 1367 (Fed. Cir. 1996) (citation omitted). The Federal Circuit has "cautioned, however, that a preliminary injunction is a drastic

---

[1] "[A]lthough a procedural matter," because motions under 35 U.S.C. § 283 "involve[] substantive matters unique to patent law," they are governed by the law of the Federal Circuit. *See Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 n.12 (Fed. Cir. 1988).

1

and extraordinary remedy that is not to be routinely granted." *Intel Corp. v. ULSI Sys. Tech., Inc.*, 995 F.2d 1566, 1568 (Fed. Cir. 1993) (citation omitted).

To demonstrate entitlement to a preliminary injunction, a movant must establish: "(1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) the injunction's favorable impact on the public interest." *Amazon.com, Inc., v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001). "These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988). The Federal Circuit, however, has placed particular emphasis on the first two factors: "a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com*, 239 F.3d at 1350 (emphasis in original). Accordingly, "[w]hile granting a preliminary injunction requires analysis of all four factors, a trial court may . . . deny a motion based on a patentee's failure to show any one of the four factors—especially either of the first two—without analyzing the others." *Jack Guttman, Inc. v. Kopykake Enters., Inc.*, 302 F.3d 1352, 1356 (Fed. Cir. 2002); *see also Chrysler Motors Corp. v. Auto Body Panels of Ohio, Inc.*, 908 F.2d 951, 953 (Fed. Cir. 1990) ("If the injunction is denied, the absence of an adequate showing with regard to any one factor may be sufficient, given the weight or lack of it assigned the other factors, to justify the denial.").

Regarding the first factor, a likelihood of success on the merits, CHS must show that, "in light of the presumptions and burdens that will inhere at trial on the merits," (1) CHS will likely prove that Apple infringes Claim 1 of the '309 patent, and (2) CHS's infringement claim will

likely withstand Apple's challenges to the validity and enforceability of that claim.[2] *See Amazon.com*, 239 F.3d at 1350. Analysis of this factor therefore requires a two-step process: (1) "the district court must determine the scope of the patent claims," and (2) "the district court must determine whether properly interpreted claims encompass the accused structure." *Hybritech*, 849 F.2d at 1455.

Given the early stages of this litigation, the parties' briefing on CHS's likelihood of success on the merits is relatively cursory in light of the complex analysis that would ultimately be required.[3] I will assume, for purposes of argument, that CHS can prove a likelihood of success on the merits. Because I find, however, that CHS has not shown that it will suffer irreparable harm if a preliminary injunction is not granted, an assessment of CHS's likelihood of success on the merits is not necessary to the adjudication of CHS's motion. *See Jack Guttman*, 302 F.3d at 1356; *see also Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 974 (Fed. Cir. 1996) (explaining that "a trial court need not make a finding on a movant's likelihood of success on the merits" if it finds in the non-movant's favor as to the irreparable harm prong).

---

[2] Although CHS's Amended Complaint asserts infringement of both the '309 and '063 patents (D.I. 21 at 2), CHS's Motion for Preliminary Injunction (D.I. 8) and supporting declaration (D.I. 11) only reference the '309 patent and the likelihood that Apple's Remote App infringes Claim 1 of that patent.

[3] CHS's infringement arguments rely solely on the Expert Declaration of Dr. Mark T. Jones, who walks through Claim 1 of the '309 patent in a step-by-step manner and compares the claim limitations to his understanding of how Apple's Remote App works. (D.I. 9 at 10–12; D.I. 11). However, Dr. Jones' analysis cautions on three separate occasions that: "Based on [his] analysis and understanding of the system, the likelihood of infringement is high, but examination of Apple's confidential information, including source code, is the best evidence to examine to be certain of the behavior of the products." (D.I. 11 at 14 n.1, 15 n.2, 18 n.3).

Likewise, Apple's briefing on CHS's likelihood of success on the merits also relies on the expert declaration of a single expert, Dr. Nathaniel Polish. (D.I. 17 at 15–17; D.I. 19). Apple's sole non-infringement argument amounts to what the Court perceives as one of differing claim constructions as to terms appearing in the final limitation of Claim 1 of the '309 patent. (D.I. 17 at 15–16). While CHS disagrees with these constructions in its Reply Brief (D.I. 20 at 7–8), neither party has adequately briefed or argued the construction of what appears to be key language. Likewise, Apple's invalidity argument notes the early stage of the litigation and points out that it has not had the benefit of discovery or claim construction, but proceeds to make two cursory arguments contesting the '309 patent's priority date and arguing that one specific piece of prior art (the "Qureshy '763 patent") anticipates the '309 patent. (D.I. 17 at 16–17).

Accordingly, because an assessment of CHS's likelihood of success on the merits is unnecessary to the adjudication of this motion, I am not expressing any opinion as to CHS's likelihood of success on the merits based upon the limited record before the Court.

3

With regard to the second factor—whether CHS will suffer irreparable harm if an injunction is not granted—CHS argues that it will suffer irreparable harm in the form of a lost business opportunity, namely that it will be unable to reenter the market and compete with Apple's Remote App. (D.I. 15 at 15). In arguing that it would not be commercially viable for CHS to compete against Apple's Remote App, CHS emphasizes that Apple offers the Remote App for free in the App Store and has already cornered the market. (*Id.* at 16). CHS also argues that because Apple provides the Remote App for free and because there is no established reasonable royalty, damages will not be an adequate remedy because they will be "next to impossible" to quantify. (*Id.* at 17).

Apple argues that CHS failed to demonstrate that it will suffer irreparable harm absent an injunction because, despite knowing that Apple released the Remote App in July 2008, CHS waited over three years after the issuance of the '309 patent to bring suit against Apple and move for injunctive relief. (D.I. 17 at 18–19). Apple argues further that CHS's willingness to license its patents, including to Apple, contradicts any assertion that money damages are not a sufficient remedy. (*Id.* at 19). Apple also contends that CHS fails to establish any causal relationship between Apple's alleged infringement and CHS's removal of its product from the market in 2008, its prolonged absence from the market since then, and its failure to reenter the market to this day. (*Id.* at 20–22). Apple concludes by arguing that any difficulty in calculating damages does not free CHS from attempting to do so, and is an insufficient reason to justify the extraordinary remedy of injunctive relief. (*Id.* at 22–23).

In its Reply Brief, CHS admits that it does not have a commercially available product, yet argues that, "[w]ithout equitable relief, CHS may be forced to abandon its product development entirely because there is little, if any, economic justification in incurring the expense of

4

developing a product only to compete against an infringing, free alternative." (D.I. 20 at 12). CHS further responds to Apple's arguments by asserting that its delay in bringing suit and moving for injunctive relief, though relevant, is not dispositive and must be weighed against other factors. (*Id.*). CHS also argues that the date that should be considered in assessing its alleged delay is the issue date of the '063 patent (May 13, 2014), rather than the '309 patent, because its Complaint set forth claims for infringement of both patents. (*Id.* at 12 n.4). CHS concludes by reiterating its contention that damages will be difficult to quantify and by asserting that it has never licensed any of its patents, contrary to Apple's assertion, and it did not previously indicate a willingness to do so. (*Id.* at 13–14).

"It is well established that" the party seeking injunctive relief "must make a clear showing that it is at risk of irreparable harm, which entails showing a likelihood of substantial and immediate irreparable injury." *Apple Inc. v. Samsung Elecs. Co.*, 695 F.3d 1370, 1374 (Fed. Cir. 2012) ("*Apple II*") (citations and internal quotation marks omitted). "[T]o satisfy the irreparable harm factor in a patent infringement suit, a patentee must establish both of the following requirements: 1) that absent an injunction, it will suffer irreparable harm, and 2) that a sufficiently strong causal nexus relates the alleged harm to the alleged infringement." *Id.* "To show irreparable harm, it is necessary to show that the infringement caused harm in the first place. . . . Thus, a likelihood of irreparable harm cannot be shown if sales would be lost regardless of the infringing conduct." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012) ("*Apple I*"). Moreover, deciding whether a plaintiff would suffer irreparable harm absent an injunction involves an inquiry into whether money damages would adequately make the plaintiff whole. *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed.

5

Cir. 2012) ("[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address.").

The Federal Circuit has also made clear that "delay in seeking a remedy is an important factor bearing on the need for a preliminary injunction." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995) (citations omitted); *see also Apple I*, 678 F.3d at 1325. In *High Tech*, the court stated, "Absent a good explanation, not offered or found here, 17 months is a substantial period of delay that militates against the issuance of a preliminary injunction by demonstrating that there is no apparent urgency to the request for injunctive relief." *High Tech*, 49 F.3d at 1557 (citations omitted). The Court noted that while delay, standing alone, was perhaps insufficient to preclude a showing of irreparable harm altogether, such delay was still a significant factor which, when combined with other factors at issue, precluded the plaintiff from showing irreparable harm. *See id.* Likewise, in previous patent cases, this Court has found that plaintiffs cannot establish the irreparable harm factor due in large part to significant delays in bringing suit and seeking injunctive relief. *See Neology, Inc. v. Fed. Signal Corp.*, 2012 WL 3236718, at *17 (D. Del. June 18, 2012) (finding that seven-month delay between the time plaintiff learned of lost sales to an alleged infringer and plaintiff's motion for preliminary injunction "weighs against granting an injunction"), *report and recommendation adopted*, 2012 WL 3236718 (D. Del. Aug. 2, 2012); *Power Integrations, Inc. v. BCD Semiconductor Corp.*, 2008 WL 5069784, at *12 (D. Del. Nov. 19, 2008) ("The three-month delay between when [plaintiff] filed this lawsuit and brought the instant Motion—in addition to the more than eight-month delay between [plaintiff's] actual loss of sales to [defendant] and [plaintiff's] filing of the Motion . . . also weighs against a finding of irreparable harm."), *report and recommendation adopted*, 2008 WL 5101352 (D. Del. Dec. 3, 2008).

Another factor to be weighed in the irreparable harm inquiry is whether or not the patentee currently has a commercially available product. *See High Tech*, 49 F.3d at 1556. "Although a patentee's failure to practice an invention does not necessarily defeat the patentee's claim of irreparable harm, the lack of commercial activity by the patentee is a significant factor in the calculus." *Id.* at 1556. In concluding that the plaintiff did not make an adequate showing of irreparable harm, the Federal Circuit in *High Tech* emphasized that the plaintiff did not make, sell, or license the infringing product and did not adequately show that "[the alleged infringer's] activities have precluded it from licensing its patent or entering the market." *Id.* (citations omitted). Moreover, in *VirnetX Inc. v. Apple Inc.*, on a post-trial motion for a permanent injunction, the plaintiff made essentially the same irreparable harm argument made by Plaintiff here: "[Plaintiff] contends that Apple's infringement prevented the company's entrance into the market, because Apple's infringing products have saturated the market, thus making it impossible for [plaintiff] to compete." *VirnetX Inc. v. Apple Inc.*, 925 F. Supp. 2d 816, 845 (E.D. Tex. 2013), *rev'd in part on other grounds sub nom. VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308 (Fed. Cir. 2014). The district court in *VirnetX* emphasized that the patentee's alleged invention was "currently unavailable commercially," and reasoned that, even taking Apple's infringement out of the equation, "one cannot say this would have guaranteed [plaintiff's success]." *Id.* at 846. The court reasoned further that "[plaintiff] has not demonstrated that Apple's infringement is responsible for [plaintiff's] failure to enter and be successful in the marketplace," and ultimately concluded that "[i]n absence of any evidence, Apple cannot be held solely responsible for [plaintiff's] failure to obtain a foothold in the market." *Id.*

Here, CHS's significant delay in bringing suit and moving for a preliminary injunction is a factor that weighs against the issuance of a preliminary injunction, "by demonstrating that there

7

is no apparent urgency to the request for injunctive relief." *High Tech*, 49 F.3d at 1557. Apple first made the Remote App available on the App Store on July 7, 2008. (D.I. 18-1 at 23). The '309 patent, the sole patent CHS seeks to enforce in its Motion for Preliminary Injunction and supporting materials, issued on January 3, 2012. (D.I. 1-1 at 2). CHS did not file the instant suit for infringement of the '309 and '063 patents until March 25, 2015, more than three years after the issuance of the '309 patent. (D.I. 1). CHS subsequently moved for a preliminary injunction on April 29, 2015. (D.I. 8). CHS's delay of over three years in moving for injunctive relief is considerably longer than the delays that the Federal Circuit and this Court have considered factors weighing against the granting of an injunction. *See High Tech*, 49 F.3d at 1557 (17-month delay); *Neology*, 2012 WL 2308202, at *17 (seven-month delay); *Power Integrations*, 2008 WL 5069784, at *12 (eight-month delay). Accordingly, I find that CHS's substantial delay is a factor weighing against the issuance of a preliminary injunction.[4]

CHS also essentially admits that it currently does not have a commercially viable product to offer. (D.I. 20 at 12 ("Without equitable relief, CHS may be forced to abandon its product development entirely . . . ."); *Id.* at 12 n.4 ("[O]nly recently did CHS embark on developing its own remote app.")). Notably, however, CHS offers no actual evidence that CHS has a product ready to go to market, that it is in the process of developing its own remote application, or even an estimation of when such a product might be ready for launch, aside from pure attorney argument that such development is occurring. CHS also offers no evidence that it has licensed

---

[4] CHS argues that it would be more appropriate for the Court to consider the May 13, 2014 issuance date of the '063 patent in its consideration of whether CHS delayed in seeking an injunction, because its action for infringement was brought to enforce both patents. (D.I. 20 at 12 n.4). Notably, however, CHS does not make any argument to enjoin infringement of the '063 patent in its Motion for Preliminary Injunction (D.I. 8) or its supporting materials (D.I. 9; D.I. 11; D.I. 20). In any event, even accepting this proposition for the sake of argument, CHS still waited over ten months from the issuance of '063 patent to move for injunctive relief. (D.I. 8). Accordingly, such delay, greater than the delays at issue in *Neology* and *Power Integrations*, would still be a relevant factor for this Court to weigh against the issuance of a preliminary injunction.

8

its patents to anyone that could thereby be harmed, or that it has actually made any efforts to do so, aside from the bare assertion that due to Apple's alleged infringement, "[d]rastic residual effects thereafter plagued CHS, such as CHS's potential investors standing idly by on the sidelines until CHS's patents issued." (D.I. 9 at 14). CHS's argument regarding its desire to reenter the market, despite having no actual product to offer, is likewise almost identical to the argument the court rejected in *VirnetX*. *See VirnetX,* 925 F. Supp. 2d at 845–46. Without an available product or any evidence that one will be available in the near future, any arguments CHS makes regarding lost profits, lost market share, lost goodwill, and lost business opportunities are speculative, if not fanciful. Accordingly, I find that CHS's lack of a commercially available product, or even a suggestion as to when such a product would be available, weakens its ability to show the type of "immediate irreparable injury" required to prove irreparable harm. *Apple II*, 695 F.3d at 1374.

In addition, even on CHS's best day, its argument that George's failure on the market was causally related to Apple's release of the Remote App (D.I. 9 at 8) appears tenuous. CHS launched George, its only tangible product, in January 2007 and ceased development and manufacturing of George in October 2008 (D.I. 21 at 4–5). CHS has not since offered any commercially available, let alone competing, product.[5] CHS does not adequately explain why it has not, in the intervening seven years, attempted to enter the marketplace with its remote control technology and compete with Apple, aside from the bare assertion that "there is little, if any,

---

[5] George was a "digital music system [] combin[ing] an iPod playback system, full feature wireless remote, BANDLESS AM/FM radio and alarm system in one product." (D.I. 9-2 at 2). It originally retailed "for $549 and $599 MSRP with a remote charging stand," prices which later appear to have been reduced to $499. (*Id.*; D.I. 18-1 at 2). The Remote App, released on July 7, 2008, was a free application one could obtain on Apple's App Store and was not a similarly comprehensive product, as it only served to control pre-existing hardware devices. (D.I. 18-1 at 23). In several places on the record, CHS and its executives admit that market factors and George's price were the primary factors leading to the product's failure. (D.I. 9 at 8; D.I. 18-1 at 18). At least with regard to the George and the Remote App, the vast differences in the nature and comprehensiveness of the two products suggests that it is highly unlikely that the release of the Remote App was a significant factor in the demise of the George.

9

economic justification in incurring the expense of developing a product only to compete against an infringing, free alternative." (D.I. 20 at 12). Ultimately, it is clear that CHS's "sales would be lost regardless of [the asserted] infringing conduct," because the George's market failure occurred for independent reasons, and it has not had any commercially available products on the market for the last seven years. *See Apple I*, 678 F.3d at 1324.

Lastly, CHS's argument that it will suffer irreparable harm because damages will be difficult to calculate—due to the fact that the Remote App is offered for free—is unsupported by pertinent legal authority.[6] (D.I. 9 at 17; D.I. 20 at 13). Indeed, calculating damages in patent cases is often a complex task, yet that alone does not allow a plaintiff to establish irreparable harm. Notably, CHS does not argue that money damages, once calculated, will not provide sufficient remuneration to CHS should Apple be found to infringe. Indeed, based upon CHS's lengthy delay in seeking injunctive relief, its lack of a commercially available product, and its failure to show a causal connection between any alleged infringement and the market failure of its products, I find that CHS would be adequately compensated by money damages should it succeed on the merits of its infringement claim. Accordingly, I find that these factors, taken as a whole, establish that CHS has not made the requisite showing of irreparable harm to justify the extraordinary remedy of injunctive relief. *See High Tech*, 49 F.3d at 1557 ("In addition to [plaintiff's] delay in seeking relief, the evidence of [plaintiff's] inactivity in the market, [its] apparent willingness to grant a license under its patent to [defendant], the absence of any indication that money damages would be unavailable to remedy any loss suffered by [plaintiff],

---

[6] CHS cites *Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed Cir. 2012), for the proposition that difficulty in calculating damages should weigh in favor of a finding of irreparable harm. (D.I. 9 at 17). Notably, *CellzDirect* contains no language even tending to support CHS's theory. *CellzDirect* merely emphasizes the point that "the irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address." *CellzDirect*, 664 F.3d at 930. Accordingly, the Federal Circuit explained that some pertinent factors in this inquiry are "[p]rice erosion, loss of goodwill, damage to reputation, and loss of business opportunities," while never mentioning difficulty in calculating damages as a pertinent factor. *See id.*

10

and the absence of any suggestion by [plaintiff] as to why relief pendente lite is needed in this case, all suggest that [plaintiff] has no compelling need for interim equitable relief.").

With regard to the third and fourth factors in the preliminary injunction calculus, the balance of hardships and the public interest, "a trial court need not make findings concerning the third and fourth factors if the moving party fails to establish either of the first two factors." *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973–74 (Fed. Cir. 1996). Because CHS has failed to meet its burden of showing irreparable harm, an analysis of the third and fourth factors is not necessary.

Plaintiff's Motion for Preliminary Injunction (D.I. 8) is **DENIED**.

It is SO ORDERED this 6 day of November, 2015.

*Richard G. Andrews*
United States District Judge